J-A11038-22
J-A11039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.M., MOTHER | : : : : : : | |
| | : | No. 1014 EDA 2021 |

Appeal from the Order Entered April 23, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000264-2020,
CP-51-DP-0002011-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S.C., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.M., MOTHER | : : : : : | |
| | : | No. 1015 EDA 2021 |

Appeal from the Order Entered April 23, 2021
In the Court of Common Pleas of Philadelphia County Juvenile
Division at No(s):  CP-51-AP-0000265-2020,
CP-51-DP-0002012-2017

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED NOVEMBER 15, 2022**

V.M. ("Mother") appeals from the decrees involuntarily terminating her parental rights to her son, C.M.M., and her daughter, A.S.C (collectively, "the Children"). She also appeals from the orders changing the Children's

permanency goals from reunification to adoption.[1] After careful review, we affirm the decrees and dismiss as moot the appeals from the goal change orders.

C.M.M. was removed from Mother's physical custody on May 23, 2017, when he was six years old, due to a Child Protective Services ("CPS") report alleging that he appeared at school that day with excessive bruising on his face and behind his ears. Trial Court Opinion, 6/21/21, at 1. The report alleged that Mother told C.M.M. not to disclose how he sustained his injuries, but he had said that they occurred after Mother hit him with a hairbrush and scissors. *Id.* He also stated that his nose and mouth were bleeding from his injuries. *Id.* at 2.

That same day, Philadelphia Department of Human Services ("DHS") workers interviewed C.M.M. in school and observed "bruising around both of [his] eyes, on both cheeks, and both arms, as well as scratches behind his ear and on his shoulder blade." *Id.* C.M.M. went to his maternal aunt's home that day, and DHS developed a safety plan for the child while in her care. *Id.* A.S.C., who was three years old, remained in Mother's home, and DHS

---

[1] These appeals are presently before us following this Court's remand for Mother to file amended notices of appeal, pursuant to *Commonwealth v. Young*, 265 A.3d 462 (Pa. 2021). *See In re C.M.M.*, 1014 EDA 2021, 2022 WL 2825437 (Pa.Super. July 20, 2022) (unpublished memorandum). Because Mother's appeals arise from the same proceeding and raise similar arguments, we consider them together.

referred Mother to the Community Umbrella Agency ("CUA") for in-home services. *Id.*

During its investigation of C.M.M.'s injuries, DHS learned that the incident between Mother and C.M.M. occurred when Mother found him cutting A.S.C.'s hair. DHS Exhibit 6. DHS concluded that the CPS report was an indicated report. In the course of the investigation, DHS learned that C.M.M. was truant; A.S.C. displayed aggressive behaviors; Mother had a history of substance abuse; and there was a history of domestic violence in the home. *Id.* at 2.

The trial court adjudicated the Children dependent, and they were placed together with foster parents ("original foster parents"). The court referred the Children for mental health assessments, and ordered Mother to attend the Achieving Reunification Center ("ARC") for domestic violence counseling. Trial Ct. Op. at 3. It also directed Mother to see the Clinical Evaluation Unit ("CEU") for drug screens and a dual diagnosis assessment, and to undergo a parenting capacity evaluation ("PCE"). *Id.*

Following a child abuse and permanency review hearing, the trial court found that Mother had perpetrated "child abuse" against C.M.M. ("child abuse order"). Mother did not appeal. The court also ordered that the CPS report be upgraded from indicated to founded. *Id.*

The Children were diagnosed with posttraumatic stress disorder ("PTSD"), and have participated consistently and separately in trauma-

focused cognitive behavioral therapy from the time of their adjudication through the subject proceedings. N.T., 2/22/21, at 42, 174-75. According to C.M.M.'s therapist from Children's Crisis Treatment Center ("CCTC"), Kaitlyn Monaghan, C.M.M. receives this treatment because of his history of physical abuse by Mother and emotional abuse by Mother's paramour, J.Z. *Id.* at 42. C.M.M. recounted in therapy that J.Z. "would duct tape him and his sister to the couch and make them watch scary movies." *Id.* at 46-47. He also recounted that J.Z. "put bugs in his food . . . [and] killed his pet turtle and put it in his bed." *Id.* at 47. Monaghan testified C.M.M. initially presented with

> a lot of hypervigilance, fear and anxiety, particularly around [M]other's . . . paramour. . . . So — feeling like he was around, seeing a red car and having triggers and memories related to that, nightmares. Overall, a lot of fear. Additionally, [C.M.M.] did have some fear around mom, his experiences of whether or not mom was telling the truth or not, a lot of hesitation around his attachment with her at that time.

*Id.* at 43.

Likewise, A.S.C.'s therapist from CCTC, Molly Reeves, testified that A.S.C. suffered emotional abuse by J.Z. *Id.* at 177. A.S.C. disclosed that J.Z. "forc[ed] her and her brother [C.M.M.] to watch scary movies." *Id.* A.S.C. also disclosed sexual abuse by J.Z. *Id.* Reeves reported that A.S.C. initially presented with "anxiety, described as frequently discussing fears of [J.Z.] and fears about scary movies . . . and intrusive thoughts and memories about [J.Z.]. . . ." DHS Exhibit 6.

Monaghan and Reeves have discussed the Children's trauma history with Mother and have assessed her "readiness to move forward with accountability, responsibility, and understanding [her] role in the [Children]'s trauma, validating the [Children]'s symptoms, and moving toward repairing the relationship between parent and child." N.T., 2/22/21, at 48-49. However, both therapists agree that Mother has consistently failed to take responsibility for the Children's trauma. *Id.* at 70, 180-82. For instance, with respect to C.M.M.'s physical injuries that led to the Children's placement, Monaghan testified that Mother attributed the injuries to a television falling on him and/or he ran into a counter. Mother subsequently "said she had tapped C.M.M. on the hand two times, and then he ran and fell." *Id.* at 51. With respect to J.Z., Monaghan testified Mother initially stated that the Children's allegations could not be true because they were never alone with him. *Id.* at 52. However, Mother subsequently indicated that she was starting to believe the Children. *Id.*

In October of 2018, Erica Williams, Psy.D., submitted her first PCE report. DHS Exhibit 9. With respect to J.Z., Dr. Williams reported that Mother claimed she was no longer in contact with him. *Id.* at 5. Further, Dr. Williams reported that Mother did not admit having abused C.M.M., and she did not acknowledge the injuries he had sustained to his face. *Id.* at 8. Dr. Williams was aware that family therapy was one of her permanency goals, but she did not recommend that it occur until Mother "demonstrat[ed] accountability for

her behavior leading to [C.M.M.'s] placement." *Id.* Dr. Williams concluded her

report with the following recommendations:

> (1)   Mother engage in individual therapy for the purpose "of identifying [the] mechanism of abuse, developing accurate narratives of the events, . . . developing ongoing plans to ensure safety of the [C]hildren. . . .";
>
> (2) family therapy should not commence without the approval of the Children's therapists and until Mother demonstrates accountability for her behavior leading to the Children's placement; and
>
> (3) visitation remain supervised until Mother enrolls in individual therapy, develops a plan to ensure the Children's safety in her care, and family therapy is established.

*Id.* at 9.

Mother complied engaged in individual therapy and developed a plan for

the Children's safety, and the trial court permitted her to have unsupervised

visitation with the Children in November 2018. Trial Ct. Op. at 5.

In November 2019, the trial court found that Mother had moderately

complied with her permanency plan and had made minimal progress in

alleviating the circumstances necessitating the Children's placement. For

instance, A.S.C.'s therapist reported that the first family session was

scheduled for November 2019, but it was canceled "due to concern that

[Mother] was verbalizing perspectives that would be emotionally damaging to

[A.S.C.], such as it was [C.M.M.]'s fault that [A.S.C.] was in foster care." Trial

Ct. Op. at 7; DHS Exhibit 6. The court reduced Mother's visitation to weekly

line-of-sight/line-of-hearing at either the agency or in the community, which continued through the time of the subject proceedings. *Id.* at 6.

Monaghan began working with C.M.M. in March 2019, at which time he was living, along with A.S.C., with the original foster parents. N.T., 2/22/21, at 62. Monaghan stated that, prior to mid-2020, C.M.M. had "a positive attachment" to the original foster parents. *Id.* at 64. However, in mid-2020, C.M.M. began to blame the original foster parents for his not being reunified with Mother. *Id.* at 76. Monaghan testified that C.M.M. "oscillates a lot between self-blame and having a more accurate understanding of why he's in placement." *Id.* at 60. C.M.M. made unspecified allegations against the original foster parents, which were ultimately deemed unfounded, and he was placed in a different foster home. *Id.* at 62-65, 112-13. C.M.M. was later moved again to a respite placement, where he resided at the time of the subject proceeding. *Id.* at 62, 195.

The record reveals that A.S.C. was also removed from the original foster parents in 2020, for unspecified reasons, and hospitalized at Belmont Hospital for mental and behavioral issues. Upon discharge, he was placed in a respite foster home. *Id.* at 175-76. At the time of the subject termination proceeding, A.S.C. was again with the original foster parents, with whom Reeves testified she has "a very stable and positive attachment." *Id.* at 188.

The Children's trauma therapists reported in June 2020 that, to resolve their PTSD symptoms, the Children need to "live with a safe, consistent,

supportive caregiver, who is able to validate and support [the] Children around their exposure to trauma and [who] can respond appropriately to their symptoms and needs, as well as prioritize their emotional and physical needs." Trial Ct. Op. at 8; DHS Exhibit 6.

On July 30, 2020, DHS filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). It also petitioned for a goal change from reunification to adoption. A hearing on the petitions occurred on February 22, 2021, and April 23, 2021, by video conference due to the Covid-19 pandemic. By the conclusion of the hearing, C.M.M. was ten years old, and A.S.C. was seven years old. The Children's best interests were represented during the hearing by a guardian *ad litem* ("GAL"), and their legal interests were represented by counsel.

At the hearing, in addition to the testimony of Monaghan, Reeves, and Dr. Williams, DHS presented testimony from CUA caseworker Denise Jenkins, and Tiffany Tillman, the DHS caseworker for the family since September of 2020. Tillman testified that Mother's outstanding permanency goals involved still needing to make the necessary progress in her individual therapy as recommended by Dr. Williams in the PCE reports and then commencing family therapy at the discretion of the Children's therapists. N.T., 2/22/21, at 193.

DHS also presented an updated report from Dr. Williams following her evaluation of Mother in August of 2020. Dr. Williams expressed concern that

Mother had consistently been "shifting in the information she reports and what she is accountable for regarding [the C]hildren's placement and ongoing placement." DHS Exhibit 10 at 10. For instance, Dr. Williams found that, although Mother denied any history of mental health, arrests and/or legal issues, and substance abuse, her records proved otherwise. *Id.* at 7-9; DHS Exhibit 9 at 5-6. Based on the foregoing, Dr. Williams recommended that Mother's mental health treatment be expanded to "include developing an accurate narrative of events in her life to best develop areas of need and support her in developing a larger capacity for accuracy and accountability in her life events." DHS Exhibit 10 at 10.

The Children's counsel presented the testimony of Roya Paller concerning their preferred outcome in the involuntary termination matter. She said that C.M.M. "was extremely clear on what adoption was and [he] really defined it quite well, and [A.S.C.] seemed to discuss adoption in terms of a forever home." *Id.* at 15. Paller testified that C.M.M. "was fine with adoption." *Id.* She testified that C.M.M.'s "real stress . . . came from knowing that he is in a home that doesn't really want him there[.]" *Id.* at 16. She explained that C.M.M. is in a respite home, and that his foster father is "very vocal" in front of C.M.M. that he is not interested in being a permanent resource. *Id.* at 17-18. With respect to A.S.C., Paller testified that she "was very clear she did not want to leave [her] foster home and wanted to live there forever, but also wanted to talk to mom once in awhile [sic]." *Id.* at 15.

Finally, Mother testified on her own behalf. The GAL recommended, and the Children's legal counsel argued, that Mother's parental rights be terminated. N.T., 4/23/32, at 45-46.

The trial court involuntarily terminated Mother's parental rights to both Children, in April 2021, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and 2511(b). It also changed the Children's permanency goals to adoption. Mother timely appealed and contemporaneously filed concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following issues for review in her appeals relating to C.M.M.:

1. Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and changing the goal to adoption because Mother is fully compliant with her goals and objectives.

2. Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(b) and changing the goal to adoption because there is evidence that [C.M.M.] is bonded to nobody except to Mother.

3. Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) because the therapeutic services offered by [DHS] are egregiously inappropriate.

4. Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) when it denied the right to cross[-]examine the DHS witnesses based on medical evidence.

Mother's Brief I at 5.[2]

Mother raises the following issues for review in her appeals relating to A.S.C.:

1.  Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and changing the goal to adoption because Mother is fully compliant with her goals and objectives.

2.  Whether the trial court erred or abused [its] discretion when terminating Mother's rights under 23 Pa.C.S.A. § 2511(b) and changing the goal to adoption because there is evidence that [A.S.C.] is bonded to Mother.

Mother's Brief II at 5.

We first review Mother's issues regarding the involuntary termination decrees. They are interrelated, and we review them together. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). We accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's

---

[2] In this disposition, we identify Mother's brief relating to C.M.M. as "Mother's Brief I" and A.S.C. as "Mother's Brief II."

ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.* at 359; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must

focus on the parent's conduct and avoid using a "balancing or best interest approach." **Interest of L.W.**, 267 A.3d 517, 524 n.6 (Pa.Super. 2021) (citation omitted). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

Instantly, we analyze the involuntary termination decrees pursuant to subsections 2511(a)(8) and (b):[3]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

>> * * *

> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

---

[3] This Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. **In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Therefore, we need not review Mother's issues with respect to Section 2511(a)(1), (2), and (5).

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy subsection 2511(a)(8), the petitioner must prove: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Subsection 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of subsection 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the court may not consider, as part of the subsection 2511(a)(8) analysis, the parent's efforts initiated after the giving of notice of the filing of the petition. 23 Pa.C.S.A. § 2511(b).

With respect to subsection 2511(b), the court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The "emotional needs and welfare of

the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." ***T.S.M.***, 71 A.3d at 267 (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. ***In re E.M.***, 620 A.2d 481, 484-85 (Pa. 1993). The existence of a bond does not necessarily result in denial of a termination petition. ***T.S.M.***, 71 A.3d at 267. Instead, the court must examine the effect on the child of severing such bond. ***Id.*** "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" ***J.N.M.***, 177 A.3d at 944 (quoting ***E.M.***, 620 A.2d at 484-85).

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re M.M.***, 106 A.3d 114, 118 (Pa.Super. 2014). "[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***Id.*** (citation omitted; alteration in original).

Instantly, Mother's arguments are premised on the bald assertion that the initial DHS investigation was flawed regarding her alleged physical abuse

of C.M.M., and this resulted in the trial court improperly issuing the child abuse order. Mother's Br. I at 12; Mother's Br. II at 11. Mother acknowledges that she "temporarily lost her control when she caught [C.M.M.] using a pair of scissors to cut his sister's hair" and "hit the child," but maintains that her conduct did not amount to "child abuse." Mother's Br. I at 12-13; Mother's Br. II at 11. She then contends that the Children's therapists based their treatment plans erroneously on the finding of physical abuse. Likewise, Mother asserts that Dr. Williams, who performed the PCE, "worked from the premise of the physical abuse as the cause for the [Children's] placement." Mother's Br. I at 13. Mother argues, "Though [she] could no longer appeal the child abuse finding, the Court can still review the issue of the appropriateness of the behavioral or mental health treatments which form the backbone of incapacity against [her]." Mother's Br. I at 12; Mother's Br. II at 11.

We disagree. Mother never appealed from the child abuse order. It was not only appropriate but necessary for the Children's therapists and Dr. Williams to base their treatments and/or recommendations on whether Mother acknowledged her physical abuse of C.M.M. As such, the premise underlying Mother's arguments is flawed.

With respect to subsection 2511(a)(8), Mother asserts that the trial court relied upon prejudicial and speculative evidence related to the second prong, *i.e.*, the conditions that led to the removal or placement of the child still exist. She argues, "When [the court] sees no progress from Mother, it's

[sic] reasoning is that things stay[ed] the same over a period of forty[-]five months." Mother's Br. I at 20; Mother's Br. II at 18. Mother asserts that this finding is not supported by the record because she made progress with her permanency plan during the first two years of the Children's dependency, and that the court erred in failing to consider that progress. *Id.* With respect to her lack of current progress, Mother baldly asserts, "The present state of conditions resulted from a change of treatment team. The case had been progressing until the current treatment team took over. The conditions actually worsened gradually under the current treatment team." *Id.*

This line of argument is meritless. Although the record indicates that Mother complied with her permanency plan and was granted unsupervised visitation at certain times during the first two years of the Children's dependency, her visitation was later reduced to supervised in November 2019, and remained so at the time of the subject proceeding, as a result of her lack of progress, which was detrimental to the Children. Upon review, there is no evidence in the certified record to support Mother's claim that her lack of progress was due to a change in the treatment team.[4]

_____

[4] Monaghan provided the only testimonial evidence regarding a change in treatment teams, specific to C.M.M. She testified:

> Q: [In] 2020, did you have concerns . . . whether service providers that pre[-]dated the current team were giving [C.M.M.] information about how much control he had over the permanency decision?

*(Footnote Continued Next Page)*

Moreover, contrary to Mother's argument, the trial court did consider her progress in the first two years of the Children's dependencies, but it was not a relevant consideration under subsection 2511(a)(8). What was relevant was the state of Mother's progress at the time of the hearing and whether reunification was imminent at that time. *See I.J.*, 972 A.2d at 11.

Furthermore, in addition to Mother's physical abuse of C.M.M., the Children have remained in placement because they were traumatized by J.Z., and Mother initially denied their allegations against him. Mother started to believe the Children's allegations at an unspecified point in 2019, including, but not limited to, that J.Z. sexually abused A.S.C. However, she then misrepresented that he was no longer in her life. N.T., 2/22/21, at 52, 181. However, Mother admitted on cross-examination by the GAL:

_____

A: Yes, I do believe that was a factor.

. . .

A: (inaudible) before this team, I do think that caused a lot of pressure to [C.M.M.], and it did cause a significant amount of harm in his relationship with the [original foster parents]. . . . [I]t has taken some time to really regain that positive feeling toward the [original foster parents].

N.T., 2/22/21, at 64-65. Although none of the parties' counsel inquired further about C.M.M.'s prior treatment team, the foregoing testimony does not support Mother's argument that the new treatment team is responsible for her lack of progress. Rather, Monaghan's testimony indicates that the prior team harmed C.M.M.'s positive relationship with the original foster parents in a manner unspecified in the record.

- 18 -

Q. [Y]ou're aware of all the concerns that have been brought up in regard to [C.M.M.]'s fear of [J.Z.]; is that correct?

A. Yes.

Q. And even with that information, you decided to renew your relationship with him; is that correct?

. . .

A. Correct.

N.T., 4/23/21, at 29-30. In fact, Mother subsequently gave birth to J.Z.'s child. N.T., 2/22/21, at 53. Monaghan testified that this caused C.M.M. to suffer "an increase in confusion, an increase in anxiety, and really not knowing what's true and what's not true." *Id.* at 59.

Monaghan testified that, in early 2020, C.M.M. "had new experiences of anxiety," which she attributed to Mother telling C.M.M. that she was dating J.Z., but that "he was not to say anything about it." *Id.* at 55-56. Monaghan testified that Mother told her there were two men with the same name and that throughout her treatment of C.M.M., the child was identifying the wrong man. *Id.* at 55. Monaghan also said that Mother had recently told C.M.M. that J.Z. was dead, which was also untrue. *Id.* at 57. Monaghan related that Mother's history of "inconsistencies related to what's being said to [C.M.M.]" included C.M.M. "being told to lie or experiencing pressure to say things that haven't happened or [not] say things that have happened. . . ." *Id.* at 60. She testified that Mother's conduct in this regard presented a barrier to

unsupervised visitation and, ultimately, to reunification with C.M.M. *Id.* at 58-
60.

Significantly, Monaghan indicated that C.M.M.'s negative behavior in
mid-2020 toward the original foster parents was caused by Mother's
inconsistencies about her involvement with J.Z. She testified:

> Q: [Y]ou indicated there was a period of emotional stability
> [C.M.M.] had with [the original foster parents].
>
> In your testimony, you also talked about him learning about
> [M]other's pregnancy, . . . some allegations that he made
> (unintelligible) [toward] [the original foster parents], and then
> some statements that he made in regard to being pressured to
> hid[e] [M]other's relationship with [J.Z.].
>
> Did I state those in the chronological sequence of when you
> understood that they occurred . . .?
>
> A. [T]hat is the chronological order in which I have heard that
> from [C.M.M.].
>
> Q. Would it be fair to say that [C.M.M.]'s behavioral disruption in
> 2020 came after the birth of [Mother's new child]?
>
> A. Yes.

*Id.* at 112-13.

Based on the foregoing, the record supports the trial court's findings.
Thus, we discern no abuse of discretion by the court's determination that the
conditions that led to the removal of the Children continue to exist.

Likewise, with respect to the final prong of subsection 2511(a)(8) – that
termination would best serve the Children's needs and welfare – we discern
no abuse of discretion. The Children's therapists and the DHS caseworker,

Tiffany Tillman, testified that the Children needed permanency. N.T., 2/22/21, at 78-81, 100-01, 183, 194. Tillman testified that it would be detrimental to A.S.C. to remove her again from the home of the original foster parents, who desire to adopt her. *Id.* at 191-92. With respect to C.M.M., Tillman testified that the plan is to return him to the original foster parents after providing therapy for him and the foster mother. *Id.* at 195-96. Monaghan similarly testified that C.M.M. has been "exhibiting symptoms related to crisis in recent weeks." *Id.* at 100. She explained:

> [C.M.M.] has historically exhibited stability with [the original foster parents]. He exhibited positive attachment with them at the time of residing with them.
>
> [C.M.M.] currently is exhibiting more crisis-prone behaviors and symptoms, I believe, in relation to his various placements, and this being a respite care provider [where he currently resides].
>
> In relation to [C.M.M.]'s relationship with [M]other, I believe that the inconsistencies related to statements that are being made to [C.M.M.] actually increased his feelings of instability and decreased emotional safety for him, between himself and his mom.

*Id.* In addition, Tillman testified that C.M.M. should be adopted because Mother could not meet his emotional and physical needs. *Id.* at 199. The record amply supports the trial court's termination of Mother's parental rights to the Children pursuant to subsection 2511(a)(8).

Turning to Section 2511(b), Mother argues that the trial court erred in terminating her parental rights because C.M.M. "is bonded to nobody but" her, "and the plan for [him] is uncertain and speculative." Mother's Br. I at 21.

Mother argues that A.S.C. is bonded to her as well, and that the court erred by not examining whether the termination of her parental rights will have a detrimental effect on A.S.C.'s developmental needs. Mother's Br. at II at 19-20. We disagree.

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." **T.S.M.**, 71 A.3d at 267. In considering the affection which a child may have for his or her natural parents, this Court has stated:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Instantly, the record reveals that the Children have suffered tragically due to the lack of stability and permanency in their lives since August of 2017, when they were adjudicated dependent. Mother's inconsistencies and/or

misrepresentations regarding her physical abuse of C.M.M. and whether she continued to be involved with J.Z. have had a detrimental effect on C.M.M., causing him to be in crisis at the time of the subject proceeding. At the time of the hearing, C.M.M. was residing in a respite home. N.T., 2/22/21, at 78-80. Monaghan testified:

> [C.M.M.]'s emotional well-being has disintegrated over the last few months in relation to his various placements.
>
> I think continuing this process much longer will lead to irreparable harm for [C.M.M.]. He does need stability[;] he does need emotional and physical safety, as well as validation of his feelings, and someone who can appropriately attune to his needs.

*Id.* at 69.

Furthermore, Paller testified that C.M.M. "was fine with adoption," and "was very clear" about it. *Id.* at 15, 18. Paller explained,

> He defined it completely. He defined it as knowing that, "Your mom and dad don't take care of you anymore. You go live with someone else forever." Those were his words. And so I said, "Well, if that happens, [C.M.M.], you know that mom and dad may not be able to see you anymore?" And he said, "That's fine. Maybe I'll call her." And I said, "That might not always be allowed when you're adopted," and he just shrugged his shoulders.
>
> . . .
>
> — it was very flat, very straight answers and the only time I saw (inaudible) emotion was, again, the nervousness of [not] knowing where he's going.

*Id.* at 18-19.

Tillman testified regarding the permanency plan for C.M.M. as follows.

Q. [D]o you believe it's in [C.M.M.]'s best interest to be freed for adoption at this time?

A. Yes.

Q. Is that based upon [his] need for a caregiver that can provide him with safety — emotional and physical — as well as to consistently meet his behavioral health needs (inaudible)?

A. Yes.

Q. And you would agree that [M]other is not able to provide that, in total, at this time?

A. Yes, at this time, no.

Q. And you believe that it has been harmful for [C.M.M.] to remain without clarity on what his permanency would be at this point?

A. Yes.

Q. And he has indicated that he is strongly bonded to his sister?

A. Yes, he is.

Q. And he indicates that he has a willingness to explore permanency through adoption, either with the [original foster parents] or an appropriate placement, correct?

A. Yes. . . . I recently talked to [C.M.M.] about returning to the [original foster parents], and he expressed that he did not, but it seems like [C.M.M.] may be (inaudible) like, in the sense he still loves the [original foster parents].

He (inaudible) says that he still loves them, he still prays for them. So, I think that (inaudible) in therapy that that's something we could continue to explore. . . .

Q. Do you believe that, although it might be painful if [M]other's [parental] rights were terminated, it would be in his best interest to have some closure around permanency and be freed for adoption?

A. Yes.

*Id.* at 199-201.

With respect to A.S.C., Paller testified that she "was very clear she did not want to leave the foster home and wants to live there forever, but also wanted to talk to mom once in a while." *Id.* at 15. Tillman testified that A.S.C. shares a parent-child bond with the original foster parents, who are a pre-adoptive resource. *Id.* at 191, 193. She recommended that A.S.C. be adopted because Mother "still has the therapy piece that needs to be worked on, and it is important that [A.S.C.] . . . reaches permanency." *Id.* at 194. A.S.C.'s therapist, Reeves, testified that A.S.C. has a parent-child bond with the original foster parents, and to remove her again from their home would be detrimental. *Id.* at 183.

Based on this record, we discern no abuse of discretion by the trial court pursuant to Section 2511(b) with respect to the Children. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa.Super. 2015) (concluding that the mother's bond with the child was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by the child's need for permanence and stability).

The Children have been without permanency and stability for a period of forty-five months, Mother had not progressed enough for the Children to be reunified with her at the time the subject proceeding, and we discern no error in the conclusion that terminating her parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. We therefore affirm the decrees.

Finally, although Mother filed notices of appeal from the goal change orders, she omits any discussion of them in her briefs. She thus waived any claim concerning the goal change orders. ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa.Super. 2017). In addition, given our disposition of Mother's appeals from the involuntary termination decrees, her appeals from the goal change orders would be moot even if she had preserved them. ***See In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa.Super. 2020).

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2022